# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

# 03-929

STATE OF LOUISIANA

IN THE INTEREST OF

T.M.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2002-0619-A
HONORABLE HERMAN C. CLAUSE, DISTRICT JUDGE

**********

## GLENN B. GREMILLION
## JUDGE

**********

Court composed of Jimmie C. Peters, Michael G. Sullivan, and Glenn B. Gremillion, Judges.

**MOTION DENIED; JUDGMENT AFFIRMED WITH INSTRUCTIONS.**

Hon. Ronald D. Cox
Judge, 15th Judicial District Court
P. O. Box 2105
Lafayette, LA 70502-2105
(337) 269-5729
Counsel for Applicant
     R. T.
     B. T.

**David Sterling Fitzgerald, Jr.**
**Cox, Fitzgerald, L.L.C.**
**202 West Main Street**
**Lafayette, LA 70501**
**(337) 233-9743**
**Counsel for Applicant**
　　　**R. T.**
　　　**B. T.**

**Charles G. Fitzgerald**
**Cox, Fitzgerald, L.L.C.**
**202 West Main Street**
**Lafayette, LA 70501**
**(337) 233-9743**
**Counsel for Applicant**
　　　**R. T.**
　　　**B. T.**

**William Tracy Barstow**
**P. O. Box 1508**
**Opelousas, LA 70571**
**(337) 942-9441**
**Counsel for Respondent**
　　　**J. F.**

**L. Antoinette Beard**
**825 Kaliste Saloom Road**
**Brandywine I, Room 218**
**Lafayette, LA 70508**
**(337) 262-1555**
**Counsel for Respondent**
　　　**Office of Community Services**

**Vivian Veron Neumann**
**P. O. Box 2220**
**Lafayette, LA 70502**
**(337) 237-1113**
**Counsel for Respondent**
　　　**T. M.**

**Marcus Anthony Allen, Sr. Esq.**
**413 Lee Ave.**
**Lafayette, LA 70501**
**(337) 289-1762**
**Counsel for Respondent**
　　　**S. M.**

GREMILLION, Judge.

This appeal stems from a judgment of the trial court denying a request by the maternal grandparents to obtain custody of the minor child, T.M., from the State of Louisiana, Department of Social Services, Office of Community Services (OCS). Subsequent to the appeal, the grandparents, B.T. and R.T., filed a Combined Motion to Annul Judgment of the Juvenile Court and to Stay All Proceedings. For the following reasons, we deny the motion, affirm the trial court's judgment, and issue instructions.

## FACTS

Js.F. is the father of three minor children, T.M., whose mother is S.M., and Je.F. and H.F., whose mother is C.F. On September 12, 2002, the Carencro Police Department raided Js.F.'s home and arrested him on charges of possession of crack cocaine, marijuana, and drug paraphernalia. C.F., who was seven months pregnant with H.F., was arrested at the home on September 15, 2002, for possession of crack cocaine and drug paraphernalia. On September 17, 2002, an Oral Instanter Order was issued ordering the removal of T.M. and Je.F. from Js.F's custody and placing them in the temporary custody of OCS. An Instanter Order confirming the Oral Instanter Order was issued on September 18, 2002, based on a verified complaint filed by Melanie Broussard, an OCS employee. The Instanter Order sought custody of the children based on a finding that Js.F.'s home "was assessed to be hazardous and unsuitable (drug paraphenalia [sic], accessible weapon, pornographic material); mother and father have a history of substance abuse and have recently been arrested on drug-related charges; father currently incarcerated and mother's whereabouts are

1

unknown."

At the time of the raid on Js.F.'s home, T.M. was visiting with his maternal grandmother, B.T., and his step-maternal grandfather, R.T., in Abbeville, Louisiana. In a September 19, 2002 Order of Continued Custody, the trial court found that reasonable grounds existed to believe that T.M. and Je.F. were children in need of care and ordered that they be placed in the custody of OCS. At the time of this hearing, OCS had placed T.M. with B.T. and R.T., while Je.F. was placed in foster care. Thereafter, OCS filed petitions requesting that the two children be adjudicated children in need of care; attorneys were appointed to represent them and C.F. On December 3, 2002, a Children in Need of Care Judgment of Adjudication and Disposition with Removal Pursuant to Articles 606, 666, and 684 of the Louisiana Children's Code was rendered by the trial court.[1] Adjudicated as children in need of care were T.M., Je.F., and H.F. H.F. was born on November 6, 2002, and came into OCS's care on November 8, 2002. At the time of his birth, both he and C.F. tested positive for cocaine.

As part of the judgment of disposition, the trial court placed the children in OCS's custody, approved its October 15, 2002 case plan, and further required the parents to cooperate with OCS and comply with the case plan. It further warned that their failure to comply could lead to a termination of their parental rights. At the time of this adjudication, both Je.F. and H.F. were placed with their maternal aunt and uncle, J.E. and T.E., in LeBlanc, Louisiana. T.M. was still placed with B.T. and R.T.

---

[1] Although the trial court entered the date on the judgment as November 3, 2002, the judgment was filed with the Lafayette Parish Clerk of Court's Office on December 3, 2002, and notice was served on the parents on December 6, 2003.

On February 23, 2003, OCS forwarded a status report to the trial court which listed the efforts and failures of Js.F. and C.F. to comply with the October 15, 2002 case plan. It further noted that S.M. was living in Denver, Colorado, and that no contact had been made with her since the December adjudication hearing. The report further accounted T.M.'s current situation: "[T.M.] is currently placed in the home of maternal grandparents, [B.T. and R.T]. [T.M.] has adjusted well to the home and is attending Dossier Elementary Pre-K. [T.M.] is also attending therapy with Christine Dugas, LCSW to address behavior problems and sexually acting out behaviors."

A case review hearing was held in this matter on March 11, 2003, pursuant to La.Ch.Code art. 692. The trial court's findings of fact at that time were that OCS had developed a case plan and had made reasonable efforts to achieve permanency for the minor children. It further found that OCS had made reasonable efforts to reunify the minor children with their parents. As a result of these findings, the trial court ordered continued custody of the children by OCS, continued foster care, and approval of the March 5, 2003 case plan and the goal of reunification. Subsequent to this hearing, a curator ad hoc was appointed to represent S.M. and C.F., both of whose whereabouts were unknown.

On May 6, 2003, B.T. and R.T. filed a Motion and Order seeking custody of their grandson, T.M., based on OCS's decision to place him in the custody of J.E. and T.E., who were no relation, in order to reunite him with his "step-siblings."[2] A May 5, 2003 order dictated that T.M. remain with B.T. and R.T. pending the outcome

_____

[2] Je.F. and H.F. are T.M.'s half-sister and brother.

of this motion. On June 20, 2003, they filed a further Motion and Order requesting, on the recommendation of Dr. David Legendre, that T.M. not be removed from their home for more than three days, every other weekend, for visitation with his father and half-siblings fearing that "it would add to *further confusion in young Mr. [T.M.]'s life.*" This order was granted.

A hearing was held on B.T. and R.T.'s custody motion on July 1-2, 2003. Following the close of evidence, the trial court rendered written reasons maintaining custody of T.M. with OCS and approving its decision to remove him from B.T. and R.T.'s home and place him with the approved foster parents, J.E. and T.E., his half-siblings' maternal aunt and uncle. Judgment was rendered on July 18, 2003. B.T. and R.T. sought supervisory writs to this court based on the trial court's denial of their motion. We denied the writ application finding that the trial court's judgment was an appealable judgment pursuant to La.Ch.Code art. 332, giving B.T. and R.T. an adequate remedy via appeal. Unpublished writ *State ex rel T.M.*, 03-929 (La.App. 3 Cir. 8/5/03). Thereafter, B.T. and R.T. sought supervisory writs from the Louisiana Supreme Court, who granted the writ and remanded the matter to this court with the instructions that we convert the writ application to an appeal.

Subsequent to B.T. and R.T.'s application for writs, OCS submitted a status report to the trial court on September 16, 2003. In the report, OCS outlined the incidents of case plan compliance or non-compliance by the parents. It also recommended that the children remain in OCS's custody for a further six months and noted that a Termination of Parental Rights staffing was set for October 20, 2003. On August 28, 2003, and September 9, 2003, counsel for B.T. and R.T. sent letters to

4

counsel for OCS requesting notice of any hearings or proceedings affecting T.M. On September 22, 2003, he wrote the Lafayette Parish Clerk of Court requesting ten days written notice of any further hearing or trial to be held in this matter. He further requested notice of the signing of any judgment or interlocutory order or judgment in this matter.

On September 23, 2003, a case review hearing was held before the trial court. Counsel for B.T. and R.T. did not receive notice of this hearing and was not present. After hearing testimony from two foster care workers, the trial court found that OCS had developed a case plan of reunification and it had made reasonable efforts to reunify the children with their parents. Based on these findings, the trial court ordered the continued custody of the children with OCS, approved the September 3, 2003 case plan, continued the children in foster care, and approved the permanent plan of reunification.

During the hearing, OCS told the trial court that it wished to decrease T.M.'s visitation with B.T. and R.T. and to cease all phone contact between them due to the negativity of B.T. Based on the trial court's judgment, OCS reduced T.M.'s visitation with B.T. and R.T. from weekend visitation once a month to supervised visitation once a month for one hour at OCS's office in Allen Parish. As a result of this judgment, B.T. and R.T. filed a Combined Motion to Annul Judgment of the Juvenile Court and to Stay All Proceedings since they did not receive notice of the September 23, 2003 hearing and because this judgment would effectively moot the July 3, 2003 judgment they had appealed.

5

## MOTION TO ANNUL AND STAY PROCEEDINGS

At the outset, we will address B.T. and R.T.'s motion to annul the trial court's September 23, 2003 judgment and to stay all juvenile court proceedings pending this appeal.

Louisiana Children's Code Article 336 provides with regard to the effects of an appeal:

> A. Except as provided by Paragraphs B and C of this Article, the effect of a judgment shall not be suspended by an appeal, unless the trial court or a court of appeal directs otherwise.
>
> . . . .
>
> C. A suspensive appeal shall not suspend the execution of the judgment insofar as the judgment relates to custody or child support.

Pursuant to Paragraph C, a trial court's judgment will not be suspended if it relates to custody. The judgment appealed by B.T. and R.T. pertains solely to the custody of T.M. Thus, their appeal does not suspend the execution of that judgment. Even if it does not relate solely to custody, we decline to order the suspension of the judgment. Although we have found very few cases pertaining to the effect of Article 336, we are not prepared to set such a precedent as asked by B.T. and R.T. because doing so could result in children being maintained in potentially dangerous or precarious situations, with possible adverse effects to their physical and/or mental well being. The trial court or juvenile court must be allowed to monitor the status of children during the children in need of care proceedings in order to make determinations in their best interest. Accordingly, we refuse to stay all juvenile court proceedings pending the outcome of this appeal.

6

With regard to notice, B.T. and R.T. argue that they sent requests for notice to OCS on August 28, 2003, and September 9, 2003. They further argue that they sent a request for notice to the Lafayette Parish Clerk of Court on September 22, 2003, the day prior to the hearing. Based on their failure to receive notice, they argue that the trial court's judgment stemming from the September 23, 2003 hearing is an absolute nullity.

The Louisiana Children's Code provides for notice pertaining to case review and permanency hearings, respectively. In both instances, OCS shall give notice to foster parents, adoptive parents, or relatives giving care of their right to appear and be heard. La.Ch.Code arts. 695 and 705. Although B.T. and R.T. were formally relatives giving care to T.M., they no longer were considered as such when T.M. was removed from their care, subsequent to the July 23, 2003 judgment. Thus, they no longer technically fit into a category of persons entitled to receive notice of hearings affecting the interest of T.M. Although they requested notice from OCS and the Lafayette Parish Clerk of Court, those entities were legally not required to provide such notice to them. Accordingly, we do find that the September 3, 2003 judgment is absolutely null.

We note that OCS's counsel states in a brief that the trial court ordered the Lafayette Parish Clerk of Court to provide B.T. and R.T. with notice regarding any future proceedings. There is nothing in the record verifying this order. Although we find that B.T. and R.T. do not technically fit into the category of persons entitled to notice pursuant to Articles 695 and 705, we hereby order that they, as T.M.'s maternal grandparents and former caregivers, should receive notice in the future of any

7

proceeding affecting his interest. Accordingly, these assignments of error are dismissed as being without merit.

### APPEAL FROM JULY 18, 2003 JUDGMENT

B.T. and R.T. raise two assignments of error on appeal. They argue that the trial court erred by failing to apply the legislative policy favoring relative placements over non-relative placements within the realm of child in need of care custody placements. They further argue that the trial court failed to apply the best interest of the child test in this matter by focusing on what was in Js.F.'s best interest, rather than on T.M.'s best interest.

### RELATIVE VERSUS NON-RELATIVE PLACEMENTS

In their first assignment of error, B.T. and R.T. argue that custody of T.M. should have been granted to them at every stage of this matter since they are his maternal grandparents. In support of their argument, they point to La.Ch.Code arts. 622, 627, 681, 683, and 702.[3] At each stage of the proceedings, they argue that

---

[3] La.Ch.Code art. 622 provides in pertinent part:

A. Unless the best interest of the child requires a different placement, a child who is determined to be abused, neglected, or harmed and whose parents have failed to protect, or who is taken into custody as a child in need of care shall be placed, pending a continued custody hearing, in accordance with this priority:

(1) In the home of a relative who is of the age of majority and with whom the child has been living in a wholesome and stable environment and who is willing and able to continue to offer such environment for the child pending an adjudication hearing.

(2) In the home of a relative who is of the age of majority and who is willing and able to offer a wholesome and stable environment for the child pending an adjudication hearing.

(3) In foster care under the supervision of the department until further orders of the court.

(4) The following, among other relatives, are those who may be considered and to whom care of the child may be entrusted and are listed in the order of priority:

8

(a) Grandparent.

(b) Aunt or uncle.

(c) Sibling.

(d) Cousin.

La.Ch.Code art. 627 provides with regard to continued custody orders, in pertinent part:

A. Following a hearing, the court may return the child to the parents, or may place the child in the custody of a relative in accordance with Article 622, or other suitable person or in the custody of the department.

B. If a child is not returned to the parents, the court shall place the child in the custody of a relative unless the court has made a specific finding that such placement is not in the best interest of the child. The court shall give specific oral and written reasons for its findings, which shall be made a part of the record of the proceedings.

La.Ch.Code art. 681 provides for dispositional alternatives, in pertinent part:

A. In a case in which a child has been adjudicated to be in need of care, the child's health and safety shall be the paramount concern, and the court may:

> (1) Place the child in the custody of a parent or such other suitable person on such terms and conditions as deemed in the best interest of the child including but not limited to the issuance of a protective order pursuant to Article 618.

> (2) Place the child in the custody of a private or public institution or agency.

> (3) Commit a child found to be mentally ill to a public or private mental institution or institution for the mentally ill.

> (4) Grant guardianship of the child to any individual.

> (5) Make such other disposition or combination of the above dispositions as the court deems to be in the best interest of the child.

La.Ch.Code art. 683 provides with regard to dispositions, in pertinent part:

A. The court shall impose the least restrictive disposition of the alternatives enumerated in Article 681 which the court finds is consistent with the circumstances of the case, the health and safety of the child, and the best interest of society.

B. The court shall place the child in the custody of a relative unless the court has made a specific finding that such placement is not in the best interest of the child. The court shall give specific written reasons for its findings, which shall be made a part of the proceedings.

La.Ch.Code art. 702 provides with regard to permanency hearings, in pertinent part:

> . . . .

9

the trial court failed to find by clear and convincing evidence that it was not in T.M.'s best interest to be placed with them. They further argue that the trial court erred in failing to reduce his findings to written reasons, as required by La.Ch.Code art. 683.

On appeal, a trial court's determination regarding child custody is to be afforded great deference and will not be disturbed absent a clear abuse of discretion. *Bagents v. Bagents*, 419 So.2d 460 (La.1982).

> The trial court is in a better position to evaluate the best interest of a child because of its superior opportunity to observe the parties and witnesses who testified at the trial. *In re State Ex. Rel. Thaxton*, 220 So.2d 184, 187 (La.App. 1 Cir. 1969). As an appellate court, we must afford great deference to the trial court's decision, not only because of that court's better capacity to evaluate witnesses, but also because of the proper allocation of trial and appellate functions between the respective courts. *Canter v. Koehring Company*, 283 So.2d 716, 724 (La.1973). Thus, the trial court's decision will not be disturbed on review except in the clearest case of abuse of the trial court's great discretion. *Bagents, supra.*

---

C. The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:

(1) Return the child to the legal custody of the parents within a specified time period consistent with the child's age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.

(2) Adoption.

(3) Placement with a legal guardian.

(4) Placement in the legal custody of a relative who is willing and able to offer a safe, wholesome, and stable home for the child.

(5) Placement in the least restrictive, most family-like alternative permanent living arrangement. The department shall document in the child's case plan and its report to the court the compelling reason for recommending this plan over the preceding higher priority alternatives.

D. The court shall consider a child's need for continuing contact with any relative by blood, adoption, or affinity with whom the child has an established and significant relationship in accordance with Article 1269.1 as one of several factors in determining the permanent plan that is most appropriate and in the best interest of the child.

10

*State ex rel. A.R.*, 99-813, p. 8 (La.App. 1 Cir. 9/24/99), 754 So.2d 1073, 1077-78; *see also Bergeron v. Clark*, 02-493 (La.App. 3 Cir. 10/16/02), 832 So.2d 327, *writ denied*, 03-0134 (La. 1/29/03), 836 So.2d 54.

The motion filed by B.T. and R.T. is, in effect, a motion to modify the November 3, 2002 judgment of disposition giving custody of T.M., along with his half-siblings Je.F. and H.F., to OCS. "A judgment of disposition may be modified if the court finds that the conditions and circumstances justify the modification." La.Ch.Code art. 716. The party bringing the motion to modify a judgment of disposition bears the burden of proving the requested change is justified. *In re H.B.*, 99-565 (La.App. 3 Cir. 10/13/99), 747 So.2d 144. Although relatives may be in a favored class to receive custody of a child in need of care, the law provides an exception when "the court has made a specific finding that such placement is not in the best interest of the child." La.Ch.Code art. 683(B). The best interest of the child trumps all other considerations in matters brought pursuant to the Child in Need of Care provisions of Title VI of the Louisiana Children's Code. La.Ch.Code art. 601. In this instance, B.T. and R.T. bear the burden of proving that the change of custody is justified.

After hearing testimony over two days in the matter, the trial court made a specific finding that it was not in T.M.'s best interest that custody be awarded to B.T. and R.T. Although the trial court did not commit its findings to written reasons, we find that its judgment is borne out by the record.

Both B.T. and R.T. testified that they love T.M. very much. They denied making any negative remarks about T.M.'s parents, siblings, or extended step-family,

11

either in or out of his presence. They stated that they have never prevented T.M. from visiting with his siblings, nor would they do so in the future if they were awarded custody. R.T. explained that T.M. was enrolled in a pre-kindergarten course at the time the case worker wished to remove him from their custody and place him with J.E. and T.E. Because T.M. was sad at not being allowed to finish the course with his friends, R.T. testified that he obtained a court order maintaining their custody. After that incident, R.T. said that he just tried to get along with everybody. He stated that B.T. was unhappy about what had happened and that she may have ruffled some feathers; however, he did not feel that she had acted unreasonably.

R.T. testified that OCS asked them to take Je.F. in, along with T.M., when the children came into custody. He stated that they refused the request because they felt that Je.F.'s blood relatives should take her. He further testified that he did not see any reason for the children to remain together since he did not think they had lived together before being taken into OCS' custody. R.T. testified that he was not aware that Js.F. had acknowledged T.M. as his child or that DNA testing had confirmed it. As to T.M.'s visitation, he stated that he only met T.E. a couple of times during exchanges/pickups. He recounted that T.E. was hostile and, as a result, he did not wish to speak to him anymore.

B.T. testified that she has always believed that Je.F. and H.F. were T.M.'s sister and brother, but could not remember if she had ever expressed a contrary opinion. She further denied ever telling T.M. that she would die if he was taken from her or that J.E. and T.E. would go to jail. B.T. testified that T.M. is scared of J.E. and T.E.'s sons, who are older, and that he does not like going to their home. She

12

recounted that T.M. showed them were J.E. and T.E.'s home was located in LeBlanc, and that they took pictures of their house, but did not stop to visit.

Dr. David Legendre, a marriage and family therapist, opined that it was in T.M.'s best interest that he remain with B.T. and R.T. He stated that T.M. was very attached to them and he felt that they had his best interest at heart. However, all of Dr. Legendre's knowledge in this matter came from B.T. and R.T., who hired him to evaluate them, or from his conversation with T.M., which lasted approximately an hour and a half. He performed no testing on any of the parties and he never spoke to any of the other persons involved in this matter, including the case worker and therapist. He stated that he tried to contact Jael Dugas, the foster care case worker, several times, but was unable to reach her. Had he been given more time, he stated that he would have examined the whole situation pertaining to T.M.'s custody with OCS. After completing his evaluation, he testified that he questioned why OCS was still involved in this matter, since he felt that it had performed its job.

In making his determination, Dr. Legendre testified that B.T. and R.T. were very open and cooperative throughout his evaluation, from which he surmised they were T.M.'s primary caregivers. In evaluating them, he stated that he questioned them about their parenting skills, ability to communicate, to participate in activities, and their future plans. Dr. Legendre testified that they volunteered the information that their relationship with T.M.'s parents had been strained over the years, but that they did not relate anything specific about Js.F. to him. He reported that the only allegation related by them concerning J.E. and T.E. was the possibility of a continuing history of drug abuse.

13

From speaking with T.M., Dr. Legendre determined that he was a very bright child, possibly ahead of his age. When questioning T.M. about his visitation with J.E. and T.E., he related that T.M. informed him of an inappropriate contact that occurred during the visitation, which caused him to seem very fearful. The contact he demonstrated was a hand in front of his pants. When he tried to learn more about the incident, Dr. Legendre stated that T.M. became very uncomfortable so he did not force the issue. When he questioned B.T. and R.T. about T.M.'s visitation, he learned that there were other children in the home and the logistics of the visitation. He stated that they did not report any incident of sexual abuse.

Dr. Legendre testified that B.T. and R.T. never informed him that Js.F. had custody of T.M., but that he deduced this fact later. He further learned from them that T.M.'s half-siblings, Je.F. and H.F. lived with J.E. and T.E., but that they did not grow up with him. However, he understood that they saw each other on sporadic visits.

Although B.T. and R.T. love T.M. and have cooperated with OCS fully, the State presented evidence of B.T.'s feelings of anger and hostility towards J.F. and C.F., and J.E. and T.E. Marla Rader, a supervisor and social worker with OCS, testified that OCS's goal has always been to keep the siblings together. When the children first came into custody, she stated that B.T. and R.T. were asked to take Je.F., along with T.M. She stated that they declined this request because Je.F. was not related to them. Radar testified that she met with B.T. and R.T. on one occasion to discuss the goal, of reuniting the children, and she recalled that B.T. became so upset that they had to abort the conversation. Rader further testified that Js.F. was in the

14

waiting room on that occasion and, when B.T. saw him, she stepped up to him and threatened to hit him with her cane.

The State further presented evidence that B.T. has expressed her feelings of anger and hostility in the presence of T.M. Christine Dugas, a licensed clinical social worker, testified that she discussed those feelings with B.T. and asked her not to express them in T.M.'s presence. However, she opined that B.T. was unable to contain her anger in front of T.M., which she, herself, witnessed on three or four occasions. Dugas opined that B.T.'s behavior went beyond what was customary or ordinary. She stated that, even when efforts were made to redirect her anger, B.T. could not contain her outbursts. Dugas further opined that this could have a very damaging effect on T.M.'s relationship with his family, possibly resulting in regression and acting out on his part due to his inability to cope emotionally with her anger. She further testified that she learned that B.T. and R.T. took T.M. with them to LeBlanc, Louisiana, to take pictures of J.E. and T.E.'s home. Dugas stated that this was not in his best interest because it involved him in their custody dispute.

Jael Dugas, a foster care case manager for OCS, testified that she has witnessed B.T.'s negativity in front of T.M., when she stated that Js.F. was "no good" and that C.F. was "trash" and a "crack addict." She stated that these comments started on her first visit to B.T. and R.T.'s home and that they continued approximately every other time she had contact with both B.T. and T.M. On one occasion, she stated that T.M. was sitting next to B.T. and he became very upset as a result of her comments.

Dugas testified that OCS began facilitating the transfer of T.M. in his

15

visitation with J.E. and T.E. after they experienced difficulty caused by B.T.'s negativity. On one occasion, she stated that T.M. became hysterical, crying, "Don't make me go." Once OCS became involved in the transfers, Dugas related that these problems disappeared.

Dugas stated that T.M. was taken into custody as an infant by OCS, from S.M., and was placed in Js.F.'s custody. She stated that he was raised by C.F., whom he considers his mother and that he loves J.E. and T.E., and considers them his aunt and uncle. She further testified that Js.F. asked that his children remain together and that he voiced concerns about the negativity displayed by B.T. in front of T.M. As a result, he reported that T.M. would pull away from him; would not interact with him in front of B.T. and R.T.; would become aggressive with Je.F., telling her to "shut up" and that she was not his sister. Dugas testified that she was afraid that T.M. would lose the bond he has with his father and siblings if he remained with his grandparents. She stated that OCS's goal is for the children to remain together. She testified that OCS wishes to place T.M. with J.E. and T.E. because they will foster T.M.'s bond with Js.F., Je.F., H.F., and B.T. and R.T. without him feeling torn between them. She stated that J.E. and T.E. are always very positive about T.M.'s grandparents and that they would allow that relationship to continue.

T.E. testified that he has known T.M. since he was a month old and that he considers him his nephew, as T.M. considers him an uncle. He stated that Je.F. and H.F. are his wife's sister's children and that they are currently placed in his home. He explained that, when he would pick T.M. up in Crowley for visitation, B.T. and R.T. were ugly toward him, which caused T.M. to throw fits, which they, in turn, blamed

16

on him. T.E. recounted that T.M. told Je.F. on many occasions, "I'm not your brother" and "your not my sister." He stated that T.M. also told Js.F. that he was not his father, but that he was "just a grandson." He further recounted that T.M. told him and J.E. that they were mean people and they would go to jail if they continued trying to take him away from his grandparents. On another occasion, T.E. stated that T.M. told them and Jael Dugas that he was going to Colorado on vacation. He testified that they asked T.M. about his vacation the next time they saw him and that he replied that he did not go because he had a "big mouth" and that he "talked too much."

In maintaining the custody of T.M. with OCS, the trial court rendered the following oral reasons:

> The Court has heard testimony how all this came about, because it was not possible at the time to place the – [T.M.] with his half sibling, [Je.F.] in the home of [J.E. and T.E.] And then after the other child, the younger child, was born, [H.F.], then the agency is now seeking to put the placement of all the children with [J.E. and T.E.], who are the – while they are not blood relatives, they are blood relatives of [T.M.]'s siblings. And the Court is convinced that there is a bond which has been created. Just like there's a bond created with the grandparents, there's also a bond that this child has created with [J.E. and T.E.] I have no problem with that.
>
> I think where the problem in this case comes in, and I think you have to go back and look at what is presently the case plan, presently the case plan, we're not talking about a permanency hearing. And I looked at the cases and the authority cited by Mr. Fitzgerald, the problem is we're not in a permanency hearing. This is simply a motion to – basically, to change custody and remove the custody from the State and place the custody with the grandparents. The problem I'm having there is that my findings are that the grandparents, while I have no doubt about their love for the child, their interest in the child, and I still have that, is working and has worked in significant measures, at counter-purposes to the case plan in this case, which is reunification with the father. In other words, if you start planting negative thoughts about the father in the presence of the child, children – even though they may not be part of the conversation, children are like sponges, they pick up everything that's said. I mean, even if you don't think they're listening, believe me, they

are listening. I guess proof of that is, my parents never spoke to me in French, but I learned to speak French. They spoke to me in English. They only spoke to each other in French. I learned French, not because they were talking to me, but because I was listening. And they're all listening. All the kids listen.

So to that extent, and maybe the biggest contributing factor. Now, in a permanency hearing, should we reach the stage where, say, it's determined that [Js.F.]'s parental rights should be terminated, there is a possibility that placement could end up with the grandparents. At this stage, given the situation of this case, given the case plan of reunification, I think it's not in the best interest of [Je.F.] [sic] to be – And I don't want it to sound that he is not well cared for; he is. But at the present time, it's not in his best interest that he remain with his grandparents, so I'm not going to grant their request for custody. And basically, I will change nothing. [Je.F.] [sic] will remain, at present in the custody of –

Ms. Beard: [T.M.]

The Court: [T.M.] [T.M.] will remain, at present, in the custody of the State, and the State will make the determination as to temporary placement of the child.

After reviewing this evidence, we cannot say that the trial court abused its vast discretion in maintaining the custody of T.M. with OCS. Although Article 683 provides that relatives are given greater priority than non-relatives in custody granted pursuant to a disposition, a specific finding by the trial court that such placement is not in the child's best interest will defeat that superior right. In this instance, the trial court made a specific finding that it was not in T.M.'s best interest to be placed in the custody of B.T. and R.T. The trial court found that B.T.'s inability to contain her negativity towards T.M.'s other family members, especially in front of T.M., was having a negative affect on him and interfered with OCS's case plan of reunifying him, along with his siblings, with his father.

In reaching its decision, the trial court heard testimony from the main

18

parties concerned and heard differing views with regard to the allegation of B.T.'s negativity and its effect on T.M. Accordingly, it was in a better position to assess the credibility of the witnesses than this court is on appeal. Since this finding is within the trial court's vast discretion, it will not be disturbed. This assignment of error is dismissed as being without merit.

## BEST INTEREST

In their second assignment of error, B.T. and R.T. argue that T.M.'s placement with J.E. and T.E., in effect, has placed him with strangers, rather than with his blood relatives. They argue that, while this was in the best interest of Js.F., it was not in T.M.'s best interest. B.T. and R.T. further raise the allegations of sexual abuse against J.E. and T.E.'s two sons and against T.E., himself.

We find no merit in these arguments. Although J.E. and T.E. are not related by blood to T.M., the trial court found that a bond did exist between them, just as a bond exists between T.M. and B.T. and R.T. Testimony was presented that T.M. considered C.F. his mother since she helped raise him from an infant. There was no evidence that he considers S.M. his mother or that she has any relationship with him. T.E. further testified that he has known T.M. since he was one month old and that he considers him his nephew, as T.M. considers T.E. his uncle. Thus, the placement of T.M. in the custody of J.E. and T.E. is not a placement with strangers as alleged by B.T. and R.T. He is with family members, albeit not blood relations, whom he has known all his life, including his siblings.

B.T. and R.T. argue several times in their brief that the trial court should

have held separate dispositional hearings for T.M. and Je.F. and H.F. In failing to do so, they claim that it was unable to distinguish between the individual circumstances of T.M., as compared to Je.F. and H.F. Thus, they argue that placing T.M. with J.E. and T.E. was in Js.F.'s best interest, rather than in T.M.'s best interest.

We disagree with this reasoning. Unfortunately, this is not a situation involving a traditional family unit consisting of father, mother, and siblings. Here, we have a complicated situation involving a father, two mothers, two siblings, and a half-sibling. Whether B.T. and R.T. wish to acknowledge it, T.M. is Js.F.'s child and the brother of Je.F. and H.F. They are a family, and it has always been OCS's plan to reunite the children with their father. Thus, the trial court did not abuse its discretion by conducting one dispositional hearing and in finding that it was in T.M.'s best interest that he remain in OCS's custody and be reunited with his sister and brother.

B.T. and R.T. further argue that Js.F. has made "substantially less than 'significant measurable progress toward reunification,'" thus the trial court should have refused to enforce OCS's case plan, "with the result that the OCS's 'basis' for removing T.M. from his grandparents would be exposed for what it actually is—unfounded." (Footnote omitted). However, whether Js.F. is complying with the case plan, whether reunification should remain as OCS's goal, and whether the case plan is valid is a determination more within the realm of the trial court's expertise.

With regard to the allegations of sexual misconduct occurring in J.E. and T.E.'s home, all that is contained in the record pertaining to these allegations are, just that, allegations. The September 19, 2002 Order of Continued Custody stated that relative placement for Je.F. was not in her best interest due to "allegations of sexual

20

abuse against the maternal uncle where [Je.F.] was placed by the mother." Nothing more is said in the record about this allegation; however, OCS later certified J.E. and T.E.'s home as an approved foster home and placed Je.F. and H.F. with them, of which placement the trial court had knowledge. In its brief, OCS states:

> At the time of [Je.F.]'s removal she had been placed with her maternal aunt and uncle, [J.E. and T.E.], but was removed temporarily, when T.M.'s grandmother made allegations of an abuse complaint in regard to the uncle, [T.E.] This allegation proved to be false and [J.E. and T.E.] have since been certified as foster parent.

When Jael Dugas was questioned about the allegations of sexual misconduct, she recounted the following:

> I do have a report from Christine Dugas, who was working with the child, and she said that a few weeks after an incident supposedly happened at the aunt and uncle's house, that [R.T.] went in and talked to her and said that so-and-so had touched [T.M.]'s penis. And she asked [R.T.] if he would – "Did [T.M.] say so and so or did [T.M.] say a name?" And he said, "[T.M.] said a name, but I don't really want to say the name." She said, "Well, I'm a mandated reporter. How would you like me to handle this?" And she said that [R.T.] said, "I would just like you to talk to [T.M.] about it, like question him about it and see what comes of it." So she had her session with [T.M.], talked about good touch/bad touch. Has any of this happened? And nothing was disclosed by the child. So when she went out after the session to tell [R.T.] that, you know, that [T.M.] didn't say anything, he said, "Well, good; we feel a lot better now."

Considering the foregoing, we find that there is no evidence in the record substantiating B.T. and R.T.'s claim of sexual misconduct by either T.E. or his sons. Had the trial court found these allegations valid, it would have taken that knowledge into consideration in reaching its decision. Accordingly, we find no merit in this assignment of error.

**CONCLUSION**

For the foregoing reasons, the judgment of the trial court maintaining

21

custody of T.M. with the State of Louisiana, Department of Social Services, Office of Community Services, is affirmed.  Moreover, B.T. and R.T.'s Combined Motion to Annul Judgment of the Juvenile Court and to Stay All Proceedings is denied.  The costs of this appeal are assessed to the defendants-appellants, B.T. and R.T.  However, the Lafayette Parish Clerk of Court  is ordered to provide future notice to B.T. and R.T. of any proceeding affecting T.M.'s interest.

**MOTION   DENIED;   JUDGMENT   AFFIRMED   WITH   INSTRUCTIONS.**